ROY S. SHORT, JR., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Short v. Commissioner
Docket No. 11125-87
United States Tax Court
T.C. Memo 1990-370; 1990 Tax Ct. Memo LEXIS 394; 60 T.C.M. (CCH) 174; T.C.M. (RIA) 90370; July 23, 1990, Filed *394 Decision will be entered under Rule 155. Arthur G. Muegler, Jr., for the petitioner. *395 Donald L. Wells, for the respondent. SHIELDS, Judge. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined a deficiency in petitioner's 1980 income tax of $ 33,746.35 and an addition to tax pursuant to section 6653(a) of $ 1,376.50. After concessions, the issues remaining for decision are (1) whether petitioner or Ampere Electric Company (Ampere), his wholly-owned corporation, is taxable on income received in 1980 from a pyramid scheme; (2) whether petitioner or Ampere was a partner in a partnership known as PACOSCO; (3) whether petitioner suffered certain losses under section 1244 [1] in 1983 which can be carried back to 1980; and (4) whether petitioner is liable for the addition to tax under section 6653(a) for negligence or intentional disregard of rules and regulations. FINDINGS OF FACT *396 Some of the facts have been stipulated and are incorporated herein by reference. Petitioner resided in St. Louis, Missouri, at the time of filing his petition in this case. For the calendar year 1980, petitioner filed a timely joint income return with his wife, Karen Short. On the 1980 return petitioner reported the receipt of income in the amount of $ 1,000 from Business Men's Venture (BMV), a pyramid investment scheme which was active in the St. Louis area during the early part of 1980. In 1985 petitioner filed a timely amended income tax return for 1980 in order to claim a deduction for a net operating loss carryback in the amount of $ 38,380 from his 1983 return. The net operating loss reported on the 1983 return, which was filed by petitioner as a single person because he and Karen Short were divorced by then, was allegedly generated by losses on section 1244 stock in Ampere and Ground Equipped Mobile Systems, Inc. (GEMS). Ampere was a Missouri corporation which had been organized in 1972 or 1973 by petitioner to perform electrical contracting. He owned all of its outstanding stock with a tax basis of $ 4,000 and was its principal officer from its organization until *397 its corporate charter was forfeited on April 18, 1984, for nonpayment of franchise tax. The record contains no evidence that Ampere ever adopted a plan to issue stock pursuant to section 1244. Ampere was engaged in the business of electrical contracting and did not make investments as a regular part of its business. From February 12, 1980, through May 1980 petitioner made several investments in the pyramid scheme being operated by BMV. Before doing so he consulted with John J. Jabouri, his accountant and the accountant for Ampere, who at that time told him that any receipts from BMV would be taxable income and suggested that the investments be made by Ampere or by petitioner, as an agent for Ampere, so that any income from BMV would be offset by the substantial operating losses which Ampere was accumulating. However, all investments made by petitioner in BMV except one were made in his own name or in the names of his parents, his children, and some of his friends. The one exception was an investment made by petitioner in the name of Ampere which investment for some unstated reason did not progress on the pyramid and therefore did not result in the return of any funds. During *398 his involvement with BMV, petitioner never indicated to anyone that his BMV investments were made on behalf of Ampere or that in making the investments he was acting as Ampere's agent. In a circular distributed at its first meeting on February 11, 1980, BMV described itself and its operation as follows: Business Men's Venture is a private investment club which offers each member the exact same opportunity to earn a maximum of $ 64,000. Here's how it works: Each person pays $ 1,000 to join the club; a $ 500 membership fee and a $ 500 sponsor fee. This new club member then sponsors two other persons to join the club and receives a $ 500 sponsor fee from each of these persons, thus the new member receives back his/her original investment of $ 1,000. The membership fees of $ 500 for each of the two other persons are paid by cashier check to a member exactly seven levels above the point at which a new member joins. Each member's name is maintained by a club secretary on a seven level chart. As the membership continues to grow, each member's name will reach the seventh level. At this level, 128 new members will pay their membership fee of $ 500 ($ 64,000 TOTAL) to the member. *399 All membership fees are personally collected and distributed by the club secretary. The club secretary is paid $ 500 by each member at the time the member receives the first of the 128 membership fees. The club does not promise or guarantee it's members any considerations for joining the club. Each person pays the same fees and has the same opportunity to earn $ 64,000, regardless of their position on the chart. The purpose of joining the club is simply to be a member. The opportunity to receive $ 64,000 is dependent on the members ability to promote memberships and the growth which results.
During 1980 petitioner received $ 64,250 from BMV. Upon receipt he deposited some of these funds in his personal checking account and placed $ 42,000 in his personal safe deposit box. At some date before May in 1980 petitioner removed the $ 42,000 from the safe deposit box and deposited it in Ampere's checking account. Upon being told by petitioner of the deposit, Betty Kamer, Ampere's bookkeeper, recorded the $ 42,000 deposit on Ampere's books as a loan from petitioner, which was the procedure she had been previously told by petitioner to follow with respect to any deposit *400 made by him to Ampere's account. At or near the end of 1980, Ampere's accountant made an adjusting entry in Ampere's books to re-characterize the $ 42,000 deposit as income to Ampere rather than as a loan by petitioner to Ampere. The $ 42,000 was reported as income on Ampere's return for the year ended January 31, 1971. Petitioner withdrew completely from BMV in May of 1980 upon learning that a court in Kansas City had ruled that BMV was an illegal pyramid scheme. PACOSCO was a partnership formed by some of the promoters of BMV in 1980 to act as BMV's recording secretary or bookkeeper. On its 1980 information return, which was filed with respondent on February 9, 1981, PACOSCO reported ordinary distributable partnership income for 1980 in the amount of $ 312,500. Attached to the partnership return of PACOSCO for 1980 was a Schedule K-1 indicating that petitioner was a partner with a 12.5-percent interest in the partnership and that his share of its income was $ 39,062.50. After PACOSCO issued the Form K-1 to petitioner, petitioner contacted Dennis Ocello, the managing partner of PACOSCO, and directed him to reissue the Form K-1 in Ampere's name. From the record it cannot be *401 determined whether this was done, but the $ 39,062.50 was reported as income on Ampere's return for the year ended on January 31, 1981. GEMS, a Missouri corporation, was organized on March 31, 1981. On or about April 3, 1981, petitioner was issued 14,000 shares of GEMS common stock, pursuant to an agreement which reads in pertinent part as follows: WHEREAS, GEMS is in need of additional capital, and is willing to sell an ownership in the company to said investor [petitioner]; and WHEREAS, [petitioner] is desirous of investing in the GEMS for a certain percentage of the ownership thereof. NOW, THEREFORE, in consideration of mutual covenants and other good and valuable considerations, the parties agree as follows: 1) [Petitioner] will lend to GEMS herewith Forty Thousand Dollars ($ 40,000.00) and will receive a Fourteen Percent (14%) interest in said company, and in addition thereto, will receive repayment from GEMS of said $ 40,000.00 from the proceeds of the sale of the first vehicle produced by GEMS. Said obligation of GEMS will be evidenced by a Promissory Note from GEMS to [petitioner], said note to bear no interest.
On April 3, 1981, GEMS gave petitioner *402 a noninterest-bearing promissory note in the amount of $ 40,000 which by its terms was "payable from the proceeds of the sale of the first vehicle produced by" GEMS. GEMS never produced a first vehicle; consequently, petitioner was not paid any part of the $ 40,000 referred to in the agreement and note. On November 1, 1983, GEMS' corporate charter was forfeited for failing to pay franchise taxes. In his deficiency notice respondent determined: (1) that petitioner received income from BMV in 1980 in the amount of $ 23,000 in addition to the $ 1,000 he reported on his 1980 return and the $ 8,000 which the parties had previously agreed to and on which the resulting tax had been assessed; (2) that petitioner and not Ampere was a one-eighth (12.5 percent) partner in PACOSCO during 1980 and failed to report his share of its distributive taxable income which share respondent determined to be $ 43,958.51; (3) that petitioner was not entitled to the net operating loss deduction claimed on the amended return for 1980 in the amount of $ 38,380 because he had failed to establish that there was such a loss in 1983; and (4) that all or part of the underpayment in tax for 1980 was due to negligence *403 or intentional disregard of rules and regulations, and consequently, petitioner was liable for the 5-percent addition to tax provided by section 6653(a). OPINION As a preliminary matter, petitioner objected at trial to the admission into evidence of PACOSCO's information return for 1980 on the grounds that it was not properly authenticated under Rule 901, was hearsay under Rules 802 and 805, was irrelevant under Rules 401 and 402 of the Federal Rules of Evidence, and was being offered without proper foundation. Petitioner also objected on grounds of hearsay to the admission of certain testimony by Revenue Agent Terry Lanning, who coordinated respondent's investigation of BMV in 1982, and to the admission of certain testimony by Revenue Agent Kathleen Kretchmar, who conducted respondent's audit of petitioner's 1980 income tax return. We have reconsidered petitioner's objections and his arguments in support thereof at trial and on brief. However, after such reconsideration we have concluded that the questioned document as well as the testimony of Mr. Lanning and Ms. Kretchmar should remain in the record. Furthermore, we note that our ultimate *404 conclusion in this case would not change even if the document and the testimony were excluded. The questioned items obviously support respondent's view of the case, but the burden of proof is not on respondent. His determinations as set forth in the notice of deficiency are presumed correct and petitioner has the burden of proving otherwise by a preponderance of the evidence. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). We are satisfied that with the questioned evidence in or out of the record, petitioner has failed to carry his burden. At trial and on brief petitioner claims that his involvement with BMV, both individually and through PACOSCO, was as an agent of Ampere, and that the taxable income from BMV and PACOSCO is taxable to Ampere and not to him. With respect to PACOSCO, petitioner goes so far as to claim that PACOSCO never existed and, even if it did, that petitioner was involved in the partnership solely as an agent for Ampere. The question of whether the agency relationships claimed by petitioner existed is to be determined by reference to the law of Missouri. Under Missouri law, it is established that "where an agent on behalf of his *405 principal enters into a contract as though for himself, and the existence of the principal is not disclosed, the contract inures to the benefit of the principal." Sonnenfeld Millinery Co. v. Uhri, 83 S.W.2d 168, 169 (Mo. App. 1935).However, under the case law of Missouri there is no particular mode, form, or method by which an agency relationship can be established. State ex rel. Kugler v. Tillatson, 312 S.W.2d 753 (Mo. 1958)."It is necessary only that the credible facts" taken as a whole, fairly disclose that a party is acting for or is representing another by the latter's authority." Wickes Lumber Co. v. Richmond Construction, 690 S.W.2d 488, 490 (Mo. App. 1985); E. B. Jones Motor Co. v. Pullen, 298 S.W.2d 448, 452 (Mo. App. 1957). Without credible corroboration, we are not required to blindly accept the self-serving testimony of petitioner that he was acting as Ampere's agent while serving as a partner in PACOSCO or when making the BMV investments. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).With two questionable exceptions, the record contains no such corroboration. One of the exceptions *406 is the inclusion in Ampere's return of the $ 42,000 received by petitioner from BMV. However, such inclusion is based upon the accounting entry made by Mr. Jabouri, the accountant for both petitioner and Ampere, at the end of Ampere's year to reverse the earlier entry made by Ampere's bookkeeper which recorded Ampere's receipt of the $ 42,000 as a loan by petitioner to Ampere rather than income to Ampere. The $ 42,000 had been received before May of 1980 by petitioner from BMV with respect to transactions conducted in petitioner's name, the names of his children, parents, or friends, and had been kept by petitioner for several months in his personal safe deposit box. Under these circumstances, the reversing entry made by the accountant has the appearance of an afterthought. The entry is rendered even more suspect by the fact that during the same period that the $ 42,000 was received by petitioner he also received at least another $ 22,250 from BMV in the same manner which was not turned over to Ampere by petitioner or reported by petitioner as income except to the extent of $ 1,000. The other exception is Mr. Jabouri's testimony that prior to any participation by petitioner in *407 the transactions with BMV, Jabouri told petitioner that for tax purposes such participation should be by Ampere or by petitioner as Ampere's agent. We find this testimony to be too vague and unspecific to be of any corroborative benefit to petitioner. In short, we conclude that when consideration is given to all of the facts, taken as a whole, petitioner has failed to carry his burden of proving that he was acting as an agent for Ampere in his dealings with BMV or as a partner in PACOSCO. Wickes Lumber Co. v. Richmond Construction, supra.Therefore, we sustain respondent's determination that petitioner and not Ampere received income from BMV in 1980 in the amount of $ 23,000 in addition to the $ 1,000 he reported on his 1980 return and the $ 8,000 which the parties have previously agreed to. We also sustain respondent's determination that petitioner and not Ampere was a one-eighth partner in PACOSCO and that his share of the partnership's distributive taxable income for 1980 was $ 43,958.51. Until the time of trial, petitioner contended that he was entitled to $ 15,000 in additional expense deductions in connection with BMV which respondent had not allowed. *408 Petitioner did not address this issue at trial or on brief. We conclude, therefore, that the issue has been conceded by petitioner. At trial the parties stipulated that petitioner had a basis of $ 4,000 in his Ampere stock. Petitioner claims to have a basis of $ 40,000 in his GEMS stock. He also claims that the stock in both corporations qualified as section 1244 [2] stock; that the stock in both corporations became worthless in 1983; and that as a result he realized an operating loss in 1983 of $ 40,000 which to the extent of $ 38,380 can be carried back to 1980. *409 Respondent contends that petitioner has failed to carry his burden of proving that the $ 40,000 referred to in the agreement with GEMS was ever paid; that if petitioner paid the $ 40,000 to GEMS it was in the form of a loan and not for the purchase of stock; and that if petitioner held stock in GEMS there is no evidence of the total capitalization of the corporation, the amount of its gross receipts for the period it operated, and the other elements necessary to determine that its stock was section 1244 stock or that such stock became worthless in 1983. With regard to the GEMS stock, petitioner's evidence consists of his testimony, which was vague and generally unhelpful, a stock certificate for 14,000 shares of GEMS stock, the promissory note for $ 40,000, the agreement with GEMS, and a deposit receipt for $ 40,000 dated April 3, 1981. The stock certificate alone has no evidentiary value since it does not reflect the purpose or the consideration for which it was issued. The agreement and the promissory note tend to support respondent's contention that if the $ 40,000 was paid by petitioner it was consideration for the note not the stock. The deposit receipt is also of no evidentiary *410 value because it does not identify the depositor, the account into which it was made, or the purpose of the deposit. Petitioner testified that he paid for the stock by check, but no such check was offered into evidence. Furthermore, the record does not contain any evidence as to the operation of GEMS, its assets, income, deductions, or whether the corporation was ever liquidated. Even if we were able to find that the transaction with GEMS was not a loan arrangement and that petitioner acquired GEMS stock for $ 40,000, there is no evidence in the record as to when if ever the stock became worthless. Therefore, we agree with respondent that petitioner has failed to meet his burden of proving that he realized an operating loss in 1983 with respect to the GEMS stock which can be carried back to and deducted in 1980. As noted above respondent has stipulated that petitioner had a basis of $ 4,000 in his Ampere stock, However, at trial and on brief, respondent did not address this issue. We conclude, therefore, that he has conceded the issue and the net operating loss deduction claimed in the amended return for 1980 is allowed to the extent of $ 4,000. In his notice of deficiency *411 respondent determined that all or part of petitioner's underpayment of tax was due to negligence or intentional disregard of rules and regulations. Petitioner has the burden of proving otherwise by a preponderance of the evidence. Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972); Rule 142(a). On this issue petitioner has offered no proof or argument, other than claiming that the underlying deficiency is incorrect. We have found for respondent on substantially all of the underlying deficiency. Therefore, in the absence of any proof to the contrary by petitioner, we sustain respondent's determination as to the addition to tax under section 6653(a). Decision will be entered under Rule 155. Footnotes
1. Except as otherwise indicated, all section references are to the Internal Revenue Code of 1954 and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. In pertinent part, section 1244 reads as follows: SEC. 1244 LOSSES ON SMALL BUSINESS STOCK. (a) GENERAL RULE. -- In the case of an individual, a loss on section 1244 stock issued to such individual or to a partnership which would (but for this section) be treated as a loss from the sale or exchange of a capital asset shall, to the extent provided in this section, be treated as an ordinary loss. * * * (c) SECTION 1244 STOCK DEFINED. -- (1) IN GENERAL. -- For purposes of this section, the term "section 1244 stock" means stock in a domestic corporation if -- (A) at the time such stock is issued, such corporation was a small business corporation, (B) such stock was issued by such corporation for money or other property (other than stock and securities), and (C) such corporation, during the period of its 5 most recent taxable years ending before the date the loss on such stock was sustained, derived more than 50 percent of its aggregate gross receipts from sources other than royalties, rents, dividends, interests, annuities, and sales or exchanges of stocks or securities. (2) RULES FOR APPLICATION OF PARAGRAPH (1)(C). -- (A) PERIOD TAKEN INTO ACCOUNT WITH RESPECT TO NEW CORPORATIONS. -- For purposes of paragraph (1)(C), if the corporation has not been in existence for 5 taxable years ending before the date the loss on the stock was sustained, there shall be substituted for such 5-year period -- (i) the period of the corporation's taxable years ending before such date, or (ii) if the corporation has not been in existence for 1 taxable year ending before such date, the period such corporation has been in existence before such date. * * * (C) NONAPPLICATION WHERE DEDUCTIONS EXCEED GROSS INCOME. -- Paragraph (1)(C) shall not apply with respect to any corporation if, for the period taken into account for purposes of paragraph (1)(C), the amount of the deductions allowed by this chapter (other than by sections 172, 243, 244, and 245) exceeds the amount of gross income. (3) SMALL BUSINESS CORPORATION DEFINED. -- (A) IN GENERAL. -- For purposes of this section, a corporation shall be treated as a small business corporation if the aggregate amount of money and other property received by the corporation for stock, as a contribution to capital, and as paid-in surplus, does not exceed $ 1,000,000. The determination under the preceding sentence shall be made as of the time of the issuance of the stock in question but shall include amounts received for such stock and for all stock theretofore issued.↩